UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RINGCENTRAL, INC., <br>           Plaintiff, <br> v. <br> DIALPAD, INC., <br>           Defendant. | Case No. 18-cv-05242-JST <br><br> **ORDER GRANTING MOTION TO DISMISS** <br> Re: ECF No. 29 |

Before the Court is Defendant Dialpad, Inc.'s motion to dismiss. ECF No. 29. The Court will grant the motion.

## I. BACKGROUND

Plaintiff RingCentral, Inc. and Defendant Dialpad, Inc. are competitors in the "cloud-based unified communications" market. ECF No. 24 ¶¶ 1-2. Both offer voice, video, and messaging services. *Id.* RingCentral alleges that Dialpad offers four levels of "a business PBX [private branch exchange] cloud based VoIP [Voice over Internet Protocol] service":

> (1) Dialpad Standard includes unlimited calling and text-based messaging in the United States and Canada, unlimited conferencing with up to 10 participants, HD video calling, single sign-on, softphones, and VoiceAI; (2) Dialpad Pro includes these same features plus call center, international offices, department audio recording, and voice transcription; and (3) Dialpad Enterprise includes all of the features of Dialpad Pro plus Enterprise SLA and Admin APIs. . . . In December 2017, Dialpad launched Dialpad Free, which purports to be a zero-cost Web-based free business VoIP phone system for businesses with five employees or less. Dialpad Free is a scaled-down version of Dialpad Pro and does not include certain features, including the ability to send and receive fax messages.

*Id.* ¶¶ 11-12. In its first amended complaint, RingCentral alleges that these products infringe four of RingCentral's patents: U.S. Patent Nos. 8,483,367 ("the '367 patent"); 8,355,496 ("the '496

1  patent"); 7,702,669 ("the '669 patent"); and 8,600,363 ("the '363 patent"). *Id.*

Dialpad contends that the asserted claims are patent-ineligible subject matter under 35 U.S.C. § 101 and now moves to dismiss all four patent infringement causes of action under Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted). In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

"Section 101 of the Patent Act defines the subject matter eligible for patent protection" by providing that "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may be patented. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014); 35 U.S.C. § 101. It is well-established that "abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (internal quotation marks and citation omitted). However, "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* at 217. Courts must distinguish between patents that claim abstract ideas, on the one hand, and patents "that claim patent-eligible applications of those concepts," on the other hand. *Id.*

To draw this distinction, courts engage in a two-step analysis. At step one, courts determine whether the claims at issue are "directed to" an abstract idea. *Id.* Claims that are "directed to a specific improvement in computer functionality" or "to a specific implementation of a solution to a problem in the software arts" are not directed to an abstract idea. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338, 1339 (Fed. Cir. 2016). "In cases involving software

2

innovations, this inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (quoting *Enfish*, 822 F.3d at 1335-36). "The purely functional nature of [a] claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea." *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016). Additionally, a claim that could be performed by a human, excising generic computer-implemented steps, is often abstract. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016); *see also Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1090 (N.D. Cal. 2016), *aff'd*, 684 F. App'x 971 (Fed. Cir. 2017) ("[A]utomation of a process using a computer is . . . insufficient to save the asserted claims from abstractness.").

If the claims are directed to an abstract idea, courts proceed to step two and "consider the elements of each claim both individually and as an ordered combination" to determine "whether [the claim] contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 217, 221 (internal quotation marks and citation omitted). "Stating an abstract idea while adding the words 'apply it' is not enough for patent eligibility. Nor is limiting the use of an abstract idea to a particular technological environment." *Id.* at 223 (internal quotation marks and citations omitted). Instead, this test "is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (internal quotation marks, alteration, and citation omitted). Both steps of the *Alice* inquiry are informed by "the claims in light of the written description." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1299 (Fed. Cir. 2016).

"Whether a claim recites patent eligible subject matter is a question of law which may contain disputes over underlying facts." *Berkheimer*, 881 F.3d at 1368. But this does not mean that patent eligibility cannot be decided on a motion to dismiss or motion for summary judgment, as "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry." *Id.* "[P]atent eligibility can be determined at the Rule 12(b)(6) stage . . . when

3

there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). In some cases, for example, the factual question of "[w]hether the claim elements or the claimed combination are well-understood, routine, [or] conventional" may "be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice."[1] *Id.* at 1128. "If there are claim construction disputes at the Rule 12(b)(6) stage, . . . either the court must proceed by adopting the non-moving party's constructions, or the court must resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction." *Id.* at 1125 (citations omitted).

## III. DISCUSSION

### A. Preliminary Matters

Before addressing each of the patents in detail, the Court resolves two issues that concern more than one patent. First, RingCentral notes that the Patent and Trademark Office found aspects of the '367, '496, and '669 patents to be distinguishable from the prior art. ECF No. 32-1 at 7 (notice of intent to issue *inter partes* reexamination certificate from '669 patent file history); ECF No. 32-2 at 3 (notice of allowability from '496 patent file history); ECF No. 32-3 at 3-4 (notice of allowability from '367 patent file history). However, these determinations are not relevant to the Court's analysis of patent eligibility. *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018) ("Nor is it enough for subject-matter eligibility that claimed techniques be novel and nonobvious in light of prior art, passing muster under 35 U.S.C. §§ 102 and 103."); *Intellectual Ventures I v. Symantec*, 838 F.3d at 1315 (holding that a "finding that Symantec did not prove by clear and convincing evidence that three particular prior art references do not disclose all the limitations of or render obvious the asserted claims does not resolve the question

---

[1] The Court grants both parties' unopposed requests for judicial notice of portions of the relevant patent file histories. ECF Nos. 30, 32; *see, e.g.*, *Phigenix, Inc. v. Genentech Inc.*, No. 15-cv-01238-BLF, 2016 WL 7985261, at *3 (N.D. Cal. Jan. 12, 2016) (taking judicial notice of excerpts from a patent file history because they were "publicly availably government records, the accuracy of which have not been questioned").

4

of whether the claims embody an inventive concept").

Second, relying on *Aatrix*, 882 F.3d at 1125, RingCentral argues that the Court must assume as true the complaint's allegations that the patents use "unconventional techniques." ECF No. 31 at 16 (citing ECF No. 24 ¶ 36); *id.* at 21 (citing ECF No. 24 ¶ 28); *id.* at 29 (citing ECF No. 24 ¶ 16). But, unlike the proposed amended complaint that the Federal Circuit found sufficient to prevent dismissal in *Aatrix*, RingCentral's complaint does not allege "specific" facts "suggest[ing] that the claimed invention is directed to an improvement in the computer technology itself and not directed to generic components performing conventional activities." 882 F.3d at 1126-28. Instead, the "unconventional" allegations are conclusory, and the Court need not accept them as true. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

The Court now turns to the four patents at issue.

### B. The '367 Patent

The '367 patent, "Messaging in a Hosted Private Branch Exchange," describes a "method and system to provide routed messages that can be routed over the Internet according to custom routing rules." ECF No. 24-1 at 2, 13. The claimed system uses a "message management server" to distribute messages, according to distribution rules, among members of the same department or between the department and an outside (i.e., non-department) user. *Id.* at 13-15, 17. For example, a message from one department member might be sent only to one other department member or to the entire department. *Id.* at 13. A message from an outside user addressed to the department is distributed to one or more department members based on distribution rules – for example, all department members who are "on duty" or based on the subject matter of the message as "determined by the application of well-known natural language processing techniques ('NLP') to the message." *Id.* at 17. For messages sent to outside users, the system indicates the identity of the individual sender only to other department users; the outside user receives only "an indication that the message is from the department, i.e. without identifying the particular department member sending the message." *Id.*

Messages also include "thread identifiers," which track messages through the system and, for example, allow the same department members to "be assigned responsibility for responding to

5

non-department caller's messages sent to the department." *Id.* at 18. Multiple department members may respond to the same thread, with department members seeing the identity of each message's author but the outside user receiving no "indication that different individual department members have sent messages within the message thread." *Id.* at 20.

RingCentral asserts claims 1, 3, 4, 7, and 8. ECF No. 24 ¶ 47. The parties agree that claim 1, the only independent claim, is representative.[2] Claim 1 recites:

> A hosted private branch exchange (PBX) system comprising:
>
>> non-transitory storage that includes subscriber identifying information that identifies a subscriber to a message routing service;
>>
>> non-transitory storage that includes distribution rules information associated with the identified subscriber; and
>>
>> a message management server configured to receive a message sent over the Internet to the identified subscriber and to send the message over the Internet to one or more devices according to the distribution rules associated with the identified subscriber;
>
> wherein the subscriber identifying information identifies a department subscriber to the message routing service and department members;
>
> wherein the distribution rules information includes department message distribution rules associated with the identified department subscriber;
>
> wherein the department message distribution rules include a first rule for distribution of a message received from a department outsider that is directed to the department;
>
> wherein the message management server distributes messages to the identified department members, according to the first rule, that include content of a message received from the department outsider and directed to the department;
>
> wherein the message management server is configured to associate a thread identifier to a message received from a department outsider and to include the associated thread identifier with the messages that it distributes to the identified department members according to the first rule;

---

[2] Consequently, the Court need not discuss every claim in determining the validity of the patent. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (no need to address more than a representative claim when "all the claims are substantially similar and linked to the same abstract idea" (internal quotation marks and citation omitted)).

6

> wherein the department message distribution rules include a second rule for distribution of a message received from a department member that is directed to a department outsider;
>
> wherein the message management server distributes messages to a department outsider and to the identified department members, according to the second rule, that include message content received from a department member that is directed to the department outsider;
>
> wherein the message management server provides an indication of an identity of the department member that the message content is received from in the messages distributed to the identified department members; and
>
> wherein the message management server provides an indication in the message distributed to the identified department outsider that the message content is received from the department but does not provide an indication in the message distributed to the identified department outsider of the identity of the department member that the message content is received from.

ECF No. 24-1 at 20-21.

At step one, Dialpad analogizes the claimed system to a corporate mailroom. RingCentral counters that the "real-time" nature of communications makes the analogy inapt, but the Court disagrees. Corporate mailrooms "receive correspondence, keep business rules defining actions to be taken regarding correspondence based on attributes of the correspondence, apply those business rules to correspondence, and take certain actions based on the application of business rules," including "gating the message for further review, . . . and also releasing, deleting, returning, or forwarding the message." *Intellectual Ventures I v. Symantec*, 838 F.3d at 1317. Likewise, here, by referencing a department roster, a person could readily determine whether a message comes from within that department or from an outsider and then use a set of distribution rules to route copies of that message to appropriate department members. A person could also assign a reference number to the message and keep a file containing all messages associated with that reference number. And a person could, for messages sent to an outsider, replace the sender's identifying information with that of the department only.[3] "[W]ith the exception of generic

---

[3] Contrary to RingCentral's argument, "permit[ting] the department to present a unified, single 'face' to the outside" is not an unconventional distribution rule. ECF No. 31 at 25. Businesses regularly respond to customers using a generic mailing address, email address, or phone number.

7

computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper," and the "patent is directed to a conventional business practice . . . in the context of electronic communications." *Id.* at 1318. Although RingCentral makes much of the fact that the patented claim is designed to work with text messages in real-time, it points to no "specific asserted improvement in computer capabilities" and fails to explain how the specified tasks could not be performed by humans. *Enfish*, 822 F.3d at 1336. Nor does RingCentral identify anything in the claim or specification that specifies a "real-time" or immediate response, and the phrase "real-time" appears nowhere in the patent. "While the claimed system and method certainly purport to accelerate the process of [routing messages], the speed increase comes from the capabilities of a general-purpose computer, rather than the patented method itself." *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016).

RingCentral asserts that its claim – and, in particular, its use of specific rules – is similar to the claim found to be patent eligible in *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299 (Fed. Cir. 2016). However, as the Federal Circuit subsequently explained, a claim is not made patent eligible simply because it "recite[s] using one of a few possible rules to analyze . . . data." *FairWarning IP*, 839 F.3d at 1094. To the contrary:

> The claimed rules in *McRO* transformed a traditionally subjective process performed by human artists into a mathematically automated process executed on computers. . . . [T]he traditional process and newly claimed method stood in contrast: while both produced a similar result, i.e., realistic animations of facial movements accompanying speech, the two practices produced those results in fundamentally different ways.

*Id.* The key to finding the *McRO* claim patent eligible was that "the claimed computer-automated process and the prior method were [not] carried out in the same way." *McRO*, 837 F.3d at 1314. In this case, as in *FairWarning IP*, the claim "merely implement[s] an old practice in a new environment." 839 F.3d at 1094. The claim is therefore directed to an abstract idea.

Turning to step two, the Court considers whether the claim "contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221. The Court finds that it does not. The elements of the claim, as well as the specification,

8

refer only to conventional computer equipment, and RingCentral does not contend otherwise. Instead, RingCentral argues that the '367 patent "offers a new solution to a new type of problem with virtual PBX call centers," and that, "[w]hen the claims of the '367 patent are examined as a whole, it is evident that the specific interaction between the distribution rules and the message management system results in a 'particular arrangement of elements' that yields a 'technical improvement over prior art ways of managing department-directed SMS messages." ECF No. 31 at 27-28 (quoting *BASCOM Global Internet Servs., Inc.v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016)). But RingCentral cites to nothing in the claims or specification of the '367 patent that supports its assertions that its identified problem is new to virtual PBX systems, or that its claimed arrangement of elements yields any specific technical improvements over the prior art, and it is to that language that courts must look to determine whether the patent "constitutes a concrete implementation of the abstract idea in the form of an inventive concept." *Affinity Labs*, 838 F.3d at 1271 (internal quotation marks and citation omitted). Unlike the claims at issue in *DDR Holdings, LLC v. Hotels.com, L.P.*, on which RingCentral relies, the claims here "recite the performance of some [known] business practice," and "the claimed solution is [not] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." 773 F.3d 1245, 1257 (Fed. Cir. 2014). "Nor, in addressing the second step of *Alice*, does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015). The claim does not contain an inventive concept sufficient to render it patent eligible.

For all of the above reasons, the '367 patent is invalid.

**C.    The '496 Patent**

The '496 patent, "Call Management Interfaces," describes "[s]ystems, methods and computer program products for generating and displaying various user interfaces for configuring one or more call handling rules associated with managing virtual PBX service rendered at an extension." ECF No. 24-2 at 2, 21. "The virtual PBX services can provide, for example, a main number, and calls made to the main number can be managed according to one or more sets of call

9

handling rules associated with the virtual PBX services and which can be configured through the user interfaces." *Id.* at 21. "For example, when an outside caller calls the virtual PBX main number for a small business, and chooses an extension, the extension user associated with that extension can be reached on a predefined mobile device, home telephone, office phone or other phone type according to the call handling rules." *Id.* at 22. These rules might, for instance, provide forwarding of calls to different numbers based on the time of day the calls are received. *Id.* at 28-29. "The user interfaces can be web-based interfaces accessible through a browser, and can be accessed only after a user or administrator has setup and activated the virtual PBX services." *Id.* at 21.

RingCentral asserts claims 1, 3-11, 13, 15, and 16. ECF No. 24 ¶ 53. The parties agree that claim 1 is representative. Claim 1 recites:

> A method comprising:
>
> receiving a user request to access profile information associated with an extension on a virtual private branch exchange (PBX) network;
>
> retrieving one or more configuration parameters associated with the extension, wherein the one or more configuration parameters include a plurality of sets of call handling rules for handling incoming calls to the extension, and wherein each set of call handling rules is associated with calls made during different respective periods of time;
>
> presenting a user interface including displaying the one or more retrieved configuration parameters in the interface;
>
> receiving a user command to update at least one configuration parameter, wherein the at least one updated configuration parameter includes an update to a first call handling rule in a first set of call handling rules associated with calls made during a first period of time; and
>
> updating the profile information based on the at least one updated configuration parameter, wherein updating the profile information comprises updating the first call handling rule for calls made during the first period of time.

ECF No. 24-2 at 33.

At step one, the Court concludes that the claim is directed to the abstract ideas of routing telephone calls based on routing parameters, such as time of day, and allowing a user to modify

those routing parameters. As Dialpad persuasively argues, these are functions that humans have routinely performed and are therefore abstract. *See, e.g.*, *Intellectual Ventures I v. Symantec*, 838 F.3d at 1316-18 (finding a claim "receiving, screening, and distributing e-mail" to be abstract); *Twilio, Inc. v. Telesign Corp.*, 249 F. Supp. 3d 1123, 1147 (N.D. Cal. 2017) ("[S]electing the best message routing option based on separately-transmitted feedback is a fundamental human activity, applied to a specific technical environment," and is "an abstract idea."). For example, corporate executives might tell their assistants that calls be directed to their office phone number during certain hours, their mobile phone number during other hours, and their home phone number during still other hours. RingCentral makes much of the claim's user interface to update those routing parameters, but the method describes nothing more than an automated way of an executive calling his or her assistant to make those changes. In both scenarios, the control is in the user's hands, and someone or something else actually makes the modifications. The claimed method is not directed to any "specific asserted improvement in computer capabilities," nor is it "necessarily rooted in computer technology." *Enfish*, 822 F.3d at 1336; *DDR Holdings*, 773 F.3d at 1257.

The Court also finds the claim to be patent ineligible under step two. As with the '367 patent, RingCentral does not contend that the elements at issue in the '496 patent – virtual PBX systems and user interfaces – are inventive. Instead, it argues that the patent survives step two because of its "non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1350. In particular, RingCentral argues that "the '496 patent departs from prior art virtual PBX systems by relocating the provisioning of a user's time-based call-handling settings to each user." ECF No. 31 at 20. However, unlike the patent at issue in *BASCOM*, nothing in the '496 patent requires location of any tool at any specific location. *See BASCOM*, 827 F.3d at 1350 ("The inventive concept described and claimed in the '606 patent is the installation of a filtering tool *at a specific location*, remote from the end-users, with customizable filtering features specific to each end user. This design gives the filtering tool both the benefits of a filter on a local computer and the benefits of a filter on the ISP server." (emphasis added)). In this case, although the claim refers to a "user request," "user interface," and "user command," neither it nor the specification provide that these be housed in any particular location or describe

how the claimed method improves any computer capabilities. ECF No. 24-2 at 33. In fact, the written description explains that "[a] user *or an administrator* can access the user interfaces using, for example, *a web browser available on a mobile device or personal computing platform*, and access the corresponding account through the user interfaces after successful authentication." *Id.* at 25 (emphasis added). Thus, the language of the patent explicitly provides that an administrator, in addition to a user, can access the user interfaces, and that the interfaces may be accessed through any web browser, including one on a mobile device. This is not inventive.

RingCentral's reliance on a single sentence in the patent does not change this result. The patent states that "[s]ervices and features typically are provisioned by the telecommunications network or on-premise servers and not the telephone device itself." ECF No. 24-2 at 21. But, as Dialpad correctly observes, "typically" is not equivalent to "exclusively." Similarly, as discussed above, the written description explains that the user interface is accessed via a web browser – a technique that is not unconventional.

Finally, RingCentral argues that dependent claims 8, 10, and 16 contain an inventive concept "by allowing the user to configure enhanced 911 [("E-911")] registration." ECF No. 31 at 21 n.7. "E-911 services . . . route an emergency call to a 911 dispatcher and provide[] the dispatcher with a geographic location (e.g., street address) from which the call is originated, while traditional 911 services route[] an emergency call to a 911 dispatcher without providing the dispatcher with geographic location information indicating where the call is originated." ECF No. 24-2 at 31. But RingCentral does not contend that it invented the E-911 system or the methods of registering for that system, and it points to no language in the claim or specification indicating that its claimed method in any way "improved [this] existing technological process." *Alice*, 573 U.S. at 223. These dependent claims do not contain an inventive concept.

For all of the above reasons, the '496 patent is invalid.

**D.     The '669 and '363 Patents**

Although RingCentral asserts two separate claims of patent infringement as to the '669 and '363 patents, the parties analyzed both patents together, and the Court does the same. The '363 patent was granted on a continuation of the application that resulted in the '669 patent. ECF No.

12

24-4 at 2. Both patents are titled, "Synchronization in Unified Messaging Systems," and they share the same specification.[4] *Id.* at 2-7; ECF No. 24-3 at 2-12. The patents describe "a unified messaging system [that] includes a server configured to store a plurality of server messages, a client configured to store a plurality of client messages and a synchronization application which synchronizes the client messages with the server messages associated with the client." ECF No. 24-4 at 9. "[A] unified messaging system integrates several different communications media to allow a user to send and retrieve voice, fax, and messages (e.g., e-mail, text, etc.) from a single interface, whether it be a phone, a fax machine, or a personal computer." *Id.* (figure citations omitted). A given user may have one or more clients (i.e., devices). *Id.* Messages on the server "are grouped into message clusters, or mailboxes, that are associated with individual users, or groups of users." *Id.* (figure citations omitted).

The "synchronization application . . . receives the state of messages in the server message storage module on the server and compares it with the state of messages in the client message storage module on the client." *Id.* at 10 (figure citations omitted). It does so by using a "discrepancy assessment [that] involves comparing the indexes of the messages stored on the server with the indexes of the messages stored on the client. . . . The discrepancy assessment can further include comparing the statuses of the messages with the same indexes on the client and on the server." *Id.* at 10-11 (figure citations omitted). "The synchronization application [then] identifies a set of actions that need to be performed to synchronize the messages on the server with the messages on the client and subsequently performs those actions." *Id.* at 10 (figure citations omitted). These actions can include adding messages, deleting messages, or changing the status of a message to read or unread. *Id.* at 11. For example, "[i]f a message on the client has been marked as 'read' since the last synchronization, the corresponding message on the server is also marked as 'read,'" and vice-versa.[5] *Id.* (figure citations omitted).

The scope of the claimed invention is broad. For example, "[t]he invention and all of the

---

[4] The Court will cite only to the '363 specification when describing the shared specification.

[5] It is unclear whether the read or unread status of the message on the server or the client takes precedence.

13

functional operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware," and "can be implemented as one or more computer program products." *Id.* "A computer program . . . can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand-alone program or as a module, component, subroutine, or other unit suitable for use in a computing environment." *Id.* And "[a] computer program can be deployed to be executed on one computer or on multiple computers at one site or distributed across multiple sites and interconnected by a communication network." *Id.* In addition, the written description allows that "[t]he invention can be implemented in a computing system that includes a back-end component (e.g., a data server), a middleware component (e.g., an application server), or a front-end component (e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the invention," or any combination thereof, and "[t]he components of the system can be interconnected by any form or medium of digital communication," including "a local area network ('LAN'), e.g., a wireless LAN, and a wide area network ('WAN'), e.g., the Internet." *Id.* Finally, "the operations of the invention can be performed in a different order and still achieve desirable results." *Id.* at 12.

RingCentral asserts claims 22-23, 26-28, and 30-31 of the '669 patent and claims 1, 14, 16, and 29 of the '363 patent. The parties agree that claim 22 of the '669 patent and claim 16 of the '363 patent are representative. Claim 22 of the '669 patent recites:

> A unified messaging system comprising:
>
> > a computer implemented server including a processor configured to store a plurality of server messages grouped into a message cluster, the server messages including voicemail messages and fax messages for a client;
> >
> > a first client configured to store a first plurality of client messages, the first client messages including voicemail messages and fax messages for the first client and corresponding to the plurality of server messages;
> >
> > a first synchronization application for synchronizing the first client messages with the server messages associated with the first client including performing at least one synchronization action selected from the group consisting of:

14

    a read/unread status of a first client message to read when a read/unread status of a corresponding server message is set to read and unread when the read/unread status of the corresponding server message is set to unread; and

    a read/unread status of a server message to read when a read/unread status of a corresponding first client message is set to read, and unread when the read/unread status of the corresponding first client message is set to unread;

  a second client that is not the first client configured to store, separately from the first plurality of client messages, a second plurality of client messages, the second client messages including voicemail messages and fax messages for the second client and corresponding to the plurality of server messages;

  a second synchronization application for synchronizing the second client messages with the server messages including performing at least one synchronization action selected from the group consisting of:

    a read/unread status of a second client message to read when a read/unread status of a corresponding server message is set to read, and unread when the read/unread status of the corresponding server message is set to unread;

    a read/unread status of a server message to read when a read/unread status of a corresponding second client message is set to read and unread when the read/unread status of the corresponding second client message is set to unread.

ECF No. 24-3 at 14.[6]

Claim 16 of the '363 patent recites:

  A unified messaging system comprising:

    a server having at least one processor and memory, the server capable of operatively coupling to a data network;

    a server message storage module configured to store a plurality of server messages, the plurality of server messages including at least one voicemail or at least one fax;

    a client message storage module configured to store a plurality of client messages, the plurality of client messages including at least one voicemail or at least one fax corresponding to the at least one voicemail or the at least one fax of the plurality of server messages; and

    a synchronization application configured to:

---

[6] Original claims 1-21 were cancelled, and new claims 22-34 added, as a result of *inter partes* reexamination. ECF No. 24-3 at 14.

|   |   |
|---|---|
| 1 | send a network request to the server over the data network; |
| 2 | receive a network response to the network request from the server over the data network, the network response comprising state information about the plurality of server messages in the server message storage module; |
| 3 | |
| 4 | identify state information about the plurality of client messages in the client message storage module; |
| 5 | |
| 6 | perform a discrepancy assessment between the state information about the plurality of server messages and the state information about the plurality of client messages; |
| 7 | |
| 8 | create a list of one or more synchronization actions based on results of the discrepancy assessment; and |
| 9 | perform the synchronization actions in the list. |

ECF No. 24-4 at 13.

At step one, RingCentral analogizes this case to *Synchronoss Technologies, Inc.v. Dropbox, Inc.*, 226 F. Supp. 3d 1000, 1007 (N.D. Cal. 2016), in which the court concluded that several patents concerning the synchronization of devices were not directed to abstract ideas because they were "directed on their face to an improvement to computer functionality: a more-efficient mechanism for synchronizing data between systems connected to a network by updating only changed data (or 'difference information'), rather than recopying all information." However, in that case, the specifications explained that "the claims are directed to improving the manner in which computers synchronize data between devices connected to a network, by making that process faster, reducing the amount of bandwidth and storage space used, enabling synchronization across different data formats, and enabling synchronization without requiring devices to be physically connected." *Id.* at 1008-09. The patents at issue in this case, by contrast, have no similar "express focus" on technological improvements. *Id.* at 1009; *see also BASCOM*, 827 F.3d at 1349 (characterizing the claims in *Enfish*, 822 F.3d at 1335-37, which were found to be patent eligible, as "unambiguously directed to an improvement in computer capabilities"). Although RingCentral argues in its opposition that the claimed invention "reduces the risk of synchronization errors caused by connectivity issues, data corruption, or other technical issues" and "preserves computer and network resources and is more efficient than conventional processes," ECF No. 31 at 10, these arguments are not tied to anything in the claims or

16

specifications that must form the basis of the Court's analysis. *Enfish*, 822 F.3d at 1335 (step one analysis examines the "claims, considered in light of the specification"); *see also FairWarning IP*, 839 F.3d at 1096-97 (rejecting suggestion that the "claimed invention recites a technological advance relating to accessing and combining disparate information sources" when the "claims [did] not recite any such improvement"); *Intellectual Ventures I v. Symantec*, 838 F.3d at 1317 ("The written description is particularly useful in determining what is well-known or conventional.").

The Court concludes that, absent any "focus on a specific means or method that improves the relevant technology," the claims are "directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO*, 837 F.3d at 1314. The functions described in the claims could all be performed by humans. For example, imagine a person who has two mobile devices (i.e., clients), which can receive both voicemail and fax messages, but who also keeps a master copy of his or her voicemail and fax messages on a desktop computer (i.e., the equivalent of a server copy). Imagine further that messages on all of those devices are stored in various electronic folders or mailboxes (i.e., clusters).[7] That person could decide at any time to synchronize the messages stored on the desktop with the messages on one or both of the mobile devices. To do so, the person – or an assistant to whom he or she made a synchronization request – could compare each folder or mailbox on the desktop with each folder or mailbox on the first mobile device, noting any discrepancies, including when the desktop and mobile device showed different read or unread statuses for a particular message. The person could then synchronize the desktop copy with the copy on the first mobile device, making changes only where required, and then repeat the process for the second mobile device. Thus, "with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from

---

[7] RingCentral repeatedly emphasizes the use of "clusters" as part of the asserted unconventional technique. But the specification defines a "cluster" as nothing more than a mailbox: "Messages are grouped into message clusters, *or mailboxes*, that are associated with individual users, or groups of users." ECF No. 24-4 at 9 (emphasis added). While nothing in the claims appears to require the "cluster-based synchronization" that RingCentral describes in its opposition, ECF No. 31 at 10, the Court will adopt RingCentral's construction for purposes of this motion. *See Aatrix*, 882 F.3d at 1125.

17

being performed by a human." *Intellectual Ventures I v. Symantec*, 838 F.3d at 1318. The claims are directed to patent-ineligible abstract ideas.

Nor does the step two analysis render the claims patent eligible. RingCentral contends that "the claim limitations of both the '363 and '669 patents specify multiple inventive concepts, including an unconventional cluster-wide discrepancy-based synchronization process, synchronization of multiple types of messages (including, specifically, fax or voicemail messages), and the ability to synchronize message clusters across multiple client devices." ECF No. 31 at 15. However, as just described, without any specific improvement to existing technological processes, all of these asserted limitations "are themselves abstract"; they are therefore not inventive. *SAP America*, 898 F.3d at 1168-69. The Court's conclusion is bolstered by the breadth of the specification, which essentially provides that any combination of generic computer equipment may be used to implement the claimed method, which need not be performed in the described sequence. *Compare* ECF No. 24-4 at 11-12 *with, e.g.*, *Amdocs*, 841 F.3d at 1301 (finding claim to be patent eligible where it was "narrowly drawn to not preempt any and all generic enhancement of data in a similar system, and [did] not merely combine the components in a generic manner, but instead purposefully arrange[d] the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks").

For all of the above reasons, the '669 and '363 patents are invalid.

## CONCLUSION

Having found all four asserted patents to be invalid, the Court grants Dialpad's motion to dismiss RingCentral's patent infringement complaint in its entirety. Although the Court doubts whether the identified deficiencies can be cured by amendment, the Court will nonetheless grant leave to amend solely to allow RingCentral an opportunity to attempt to plead patent eligibility. *See Aatrix*, 882 F.3d at 1126-28 (finding abuse of discretion where district court denied leave to amend); *Papst Licensing*, 193 F. Supp. 3d at 1095 (dismissing with prejudice infringement claims where "the asserted claims are directed to patent-ineligible subject matter, a defect which cannot be cured through amendment of a complaint"). RingCentral may file a second amended complaint within 21 days of the date of this order. Failure to file a timely second amended complaint will

result in dismissal with prejudice.

**IT IS SO ORDERED.**

Dated: March 8, 2019

_____
JON S. TIGAR
United States District Judge