CLEMENT ROBERTS (SBN: 209203)
croberts@orrick.com
JOHANNA JACOB (SBN: 286796)
jjacob@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

AMY VAN ZANT (SBN: 197426)
avanzant@orrick.com
LILLIAN MAO (SBN: 267410)
lmao@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: (650) 614-7400
Facsimile: (650) 614-7401
*Attorneys for Plaintiff*
RINGCENTRAL, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RINGCENTRAL, INC.,<br>Plaintiff,<br>v.<br>DIALPAD, INC.,<br>Defendant. | **Case No.: 3:18-cv-5242-JST**<br>**SECOND AMENDED COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff RingCentral, Inc. ("RingCentral" or "Plaintiff") as and for its Second Amended Complaint against defendant Dialpad, Inc., ("Defendant" or "Dialpad"), states and alleges as follows:

## THE PARTIES

1. RingCentral is a Delaware corporation with a place of business at 20 Davis Dr., Belmont, CA 94002. RingCentral (NYSE: RNG) is the Gartner Magic Quadrant leader in providing cloud-based unified communications as a service. Its software-as-a-service platform provides a comprehensive set of business communications features for voice, virtual private branch exchange ("vPBX"), audio and video conferencing, messaging, contact center, collaboration, SMS, online meetings, contact center, and fax. The World Economic Forum has recognized Vladimir Shmunis, RingCentral's co-founder, CEO, and Chairman, with the "Technology Pioneer of the Year Award," and RingCentral has won numerous industry awards recognizing its world-class, leading technology solutions.

2. Dialpad is a Delaware corporation with its headquarters located at 100 California St., Suite 500, San Francisco, CA 94111. Dialpad provides the cloud-based unified communications market with business phone solutions, including voice, video, and messaging.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §§ 1331, 1338, in that RingCentral seeks, *inter alia*, relief for Dialpad's infringement of RingCentral's patents.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391 and 28 U.S.C. § 1400 because Dialpad's principal place of business is within the Northern District of California.

5. This Court has personal jurisdiction over Dialpad because Dialpad is based in the Northern District of California and has committed acts of patent infringement in this jurisdiction.

## INTRADISTRICT ASSIGNMENT

6. Pursuant to Local Rule 3-2(c), intellectual property actions are assigned on a district-wide basis.

## BACKGROUND

### Relevant RingCentral History

7. About twenty years ago, RingCentral was founded with a vision to offer unified cloud-based communication products and services for businesses. RingCentral's cloud-based communications platform provides a diverse set of robust and innovative features and functionalities. RingCentral's technology enables customers to connect multiple devices, including desktops, laptops, smartphones, and tablets so that they can seamlessly communicate through audio calls, voice messages, text messages, faxes, and collaboration tools. RingCentral provides this functionality through easy-to-use interfaces that implement message threading, preview, and transcription to intelligently display the heterogeneous messages that its customers receive. RingCentral's product offerings—including RingCentral Office®, RingCentral Meetings™, RingCentral Fax®, RingCentral Glip™, and RingCentral Professional™—work well in both small and medium size business and large enterprises, and allow companies of any size to set up departments, extensions, and routing rules to manage incoming calls. The Patents-in-Suit claim innovative features that solve problems unique to these new technological products.

### General Background of the Technology at Issue

8. In order to understand the complexities of the inventions claimed by the Patents-in-Suit, it is necessary to first understand the history of Private Branch Exchange ("PBX"). A PBX system is typically a system used by businesses in order to route incoming calls internally within the business and outgoing calls externally.

9. Before PBX, all ingoing and outgoing calls were distributed to and from a business premises via a switchboard and switchboard operators who manually directed calls. Every phone in the business premises needed its own hardwired telephone line. Companies depended on public telephone companies in order to provide these services, including inter-company calls.

This became costly, especially as companies grew to include multiple departments and large numbers of employees. Eventually, companies solved some of these issues by investing in internal private switchboards and switchboard operators. These private switchboards were the very first rudimentary version of PBX. This allowed companies to reduce the number of public phone lines routed in to the company and distribute calls within the company without using public phone lines. The switchboards took up a significant amount of space within the company—as it was all hard-wired—and also required a large upfront investment in hardware. Later, manual PBX switchboards became electronic and automated, such that a switchboard operator was no longer necessary in order to direct calls. Instead, a call would be automatically routed through a switchboard based on the number the caller dialed.

10. The next chapter in PBX history, involved time division multiplexing ("TDM"), a method of splitting multiple transmissions into an alternating pattern using synchronized switches, thereby allowing multiple transmissions to be sent over the same transmission line. TDM allowed PBX to transition from analog to digital transmission, it allowed for the switchboard system to be downscaled in to something that resembled a large computer, and it permitted the addition of lines and hold music through the addition of a new board to the system. Systems typically required the purchase of compatible technology and phones and therefore a business became locked into a certain company's hardware. This was still cost prohibitive to many companies.

11. With the commercialization of the internet in the 1990s and the advent of voice over IP technologies in the mid-1990s a new generation of PBX technology was born, which allowed for the communication of not just traditional phone calls but also internet-based methods of communications to flow through the same system. Yet another landmark in PBX technology was the ability to host and provision PBX systems in the cloud—completely eliminating the need for legacy and costly TDM hardware systems. With the advent of virtual PBX technology, came unique issues and problems to overcome that did not previously exist in the prior generation hardware systems. For example, the prior generation hardware systems did not need to contend with the heterogenous message types that would flow through the internet, *e.g.*, SMS, MMS, E-

Mail, Fax, Voice, etc., through heterogeneous devices, *e.g.*, laptops, tablets, cell phones, internet connected desk phones, etc. In the context of virtual PBX, this would come to be referred to as a "Unified Messaging System," *e.g.*, a system that permits heterogeneous messages to be sent or received from any type of internet enabled device through any type of platform. At the time of its founding in 1999 (and still too today), RingCentral was a pioneer in this new frontier of technology and solved many of the complex issues facing virtual PBX technology. RingCentral's patent portfolio discloses inventions that solve these complex issues.

**Patents-In-Suit**

12. RingCentral has been a leader in developing the technological solutions necessary to move a VoIP-based unified communications platform into the cloud while enabling flexibility of user devices on the client side. RingCentral's pioneering efforts in developing cloud-based communication products and solutions have culminated in the issuance of over 150 patents worldwide, including U.S. Patent Nos. 8,483,367 ("the '367 Patent") (Exhibit A); 8,355,496 ("the '496 Patent") (Exhibit B); 7,702,669 ("the '669 Patent") (Exhibit C); and 8,600,363 ("the '363 Patent") (Exhibit D) (collectively, "the Patents-in-Suit," attached hereto as Exhibits A, B, C, and D).

13. Dialpad has had knowledge of its infringement of the Patents-in-Suit (with the exception of the '496 Patent), since at least July 20, 2018, when counsel for RingCentral sent Dialpad's CEO, Craig Walker, a letter demanding that Dialpad "cease and desist" its "unauthorized use" of the Patents-in-Suit and identified specific Dialpad products that infringe each of the Patents-in-Suit. As to the '496 patent, Dialpad has had knowledge of the patent since at least the filing of the First Amended Complaint.

**DIALPAD INFRINGES RINGCENTRAL'S PATENTS-IN-SUIT**

14. Dialpad offers VoIP-based unified communications as a service. In entering the market, Dialpad heavily leveraged RingCentral's innovations—including at least the inventions claimed in the Patents-in-Suit—to offer its competing product lines but did so without a license or permission from RingCentral.

15. In January 2015, Dialpad launched a business PBX cloud-based VoIP unified messaging service. Dialpad offers its PBX service at three increasing price points with increasing levels of functionality: (1) Dialpad Standard includes unlimited calling and text-based messaging in the United States and Canada, unlimited conferencing with up to 10 participants, HD video calling, single sign-on, softphones, and VoiceAI; (2) Dialpad Pro includes these same features plus call center, international offices, department audio recording, and voice transcription; and (3) Dialpad Enterprise includes all of the features of Dialpad Pro plus Enterprise SLA and Admin APIs. With these increasing price point packages, Dialpad also increases its third-party integration enablement and its level of customer support.

16. Dialpad Standard, Dialpad Pro, and Dialpad Enterprise (collectively, "the Infringing Products") infringe RingCentral's intellectual property rights. Dialpad makes, uses, sells, and offers to sell the Infringing Products.

17. The Infringing Products use the technology claimed in the Patents-In-Suit in a plurality of ways. Among other things, the Infringing Products comprise cloud-based virtual PBX unified messaging services that enable multiple users to communicate using a variety of devices (*e.g.*, mobile phones, desktop phones, and computers) and communications means (*e.g.*, SMS text messages, faxes, and voice calls/voicemails) while synchronizing sent/received voice and fax messages across the multiple devices. The Infringing Products implement user interfaces that allow for message previews, threading, transcription, and call routing. The Infringing Products also support message-management server configurations that enable subscriber-identifying information in communications between internal subscribers of the system to be displayed differently than in communications between a subscriber department and an external user.

**Dialpad's Infringement of the '367 Patent**

18. RingCentral owns, and has for all relevant times owned, all right, title, and interest in the '367 Patent, titled "Messaging in a hosted private branch exchange." (*See* Exhibit A). Each of the claims of the '367 Patent is presumed valid. The '367 Patent solves the problem of routing internet and non-internet based messages between subscribers of a PBX system to one or

more devices outside of the subscriber system, and, more specifically, using a "message management server" to addresses the unique problems that arose in implementing text-based messaging for a department subscriber of a PBX system.

19. The '367 Patent recognized that "[a]dvances in wireless networking and message technologies have given mobile users opportunities to engage in a variety of different Internet and non-Internet based communications. For example, existing devices and platforms include personal digital assistants (PDAs), cell phones with wireless application protocol (WAP) or short message service (SMS), e-mail devices supporting Post Office Protocol 3 (POP3) and/or (Internet Message Access Protocol) IMAP, facsimile services, and instant messaging." '367 Patent at 1:6-15. The introduction of messaging for a variety of message types over internet and non-internet based networks introduced problems unique to VoIP-based hosted PBX universal message systems, including, specifically, for real-time and near real-time messaging.

20. In particular, the '367 Patent addresses problems in real-time or near real-time messaging like instant messages and text (SMS) messages. *Id.* at 1:9-15. The '367 Patent claims a "hosted private branch exchange (PBX) system" that includes "a message management server configured to receive a message sent over the Internet to the identified subscriber and to send the message over the Internet to one or more devices according to the distribution rules associated with the identified subscriber." *Id.* at Claim 1. The specification teaches that "the term 'message' signifies a short text message that is sent to or from a communication device over a direct connection with a wireless mobile telecommunication network or the Internet that is compatible with the short message service ('SMS') protocol." *Id.* at 2:65-3:2.

21. As alleged above, hosted or virtual PBX systems for universal message systems were a new technology that presented new opportunities and challenges that did not exist in prior art PBX systems. The '367 Patent explains: "A conventional PBX system typically connects phones of PBX system subscribers with each other and with the PSTN [public switched telephone network]," whereas "[a] hosted PBX system comprises servers that are accessible over the Internet and that provide phone call and phone message routing and delivery services over the

Internet to and from subscribers' devices." *Id.* at 6:40-45; *see also id.*, Fig. 3 (showing a unified messaging system). "Unlike a premises-based PBX, which typically requires PBX equipment to be physically located on or near the user premises where the PBX services are to be provided, a hosted PBX can provide PBX communication services over the Internet, including services such as, without limitation, voice over IP (VOIP), facsimile over IP (FOIP), call forwarding, voicemail, web-based online account management, and other similar PBX functions. In some embodiments, for example, a phone call or message to a phone number associated with the hosted PBX system is sent over the Internet to the hosted PBX system (e.g., via a PSTN or SMS Gateway), which connects the call or message over the Internet to a phone or other Internet-connected device of a subscriber to the hosted PBX system." *Id.* at 6:49-63. Providing services over the Internet enabled support of types of messaging, including SMS messages and IMs, that were previously unsupported by conventional PBX systems. SMS messages and IMs, unlike other types of messaging, are real-time or near real-time text-based messages that can be sent over the Internet. In contrast, emails, facsimiles, and voice messages are not generally understood to be a real-time or near real-time form of communication.

22. The '367 Patent inventors recognized that the real-time and near real-time communications nature of SMS messages required a different type of communications structure than the kind of messages that had been transmitted over conventional PBX systems. As a result, they conceived of a hosted PBX system to support messaging not just between two individuals, but between a group (i.e., members of a department) reachable by a single telephone number and an individual user outside of the department. In plain English, the inventors realized that SMS messaging over a hosted PBX system between a person seeking customer service help and a customer service support department would require a different type of communications system than previous types of messaging systems. Specifically, the invention of the '367 Patent "support[s] departmental message flow involving mobile devices of department members and a mobile device of a user who is not a department member . . . . [T]he term 'department' signifies one or more users that are members of a group (i.e., department) that can be reached from a

telephone number (i.e., a department telephone number)." *Id.* at 2:50-61. The claims recite that "the subscriber identifying information identifies a department subscriber to the message routing service and department members," and claim specific "department message distribution rules" that solve a problem unique to such department messaging. *Id.* at Claim 1.

23. Conventional instant messaging is a form of online chat that offers real-time text transmission over the internet, typically consisting of short messages transmitted between two parties. Similarly, in conventional text messaging, a short message of up to 160 characters is sent between two mobile devices. The sender and recipient have symmetrical information about the message's origin and destination (*i.e.*, that it was sent from a certain number and addressed to a certain number or recipient). Text messages are sent via the control channel used by mobile phones to continually communicate with cell phone towers. Because of the speed of such transmissions, and the fact that many people keep their mobile devices close at hand throughout the day, text messaging, like instant messaging, offers a real time communication medium resembling live conversations. *See, e.g.*, Reid & Reid, "Insights into the Social and Psychological Effects of SMS Text Messaging" (Feb. 2004) ("[T]he immediacy, mobility, and perpetual accessibility afforded by the mobile phone allows near-conversational levels of synchronous texting, such that an exchange of text messages can resemble online chat in turn taking and discourse structure."); Bradley, "Email vs. IM vs. SMS: Choosing the Right One," *PC World* (Jan. 13, 2012) ("[Text messaging] is immediate. Like instant messaging, SMS text messages get from Point A to Point B in real-time."). The '367 Patent reflects this well-understood nature of instant messaging and SMS communications. *See, e.g.*, '367 Patent at 11:18-28 (describing a sequence of messages that constitute a "conversation" or "thread"), *Id.* at Figs. 10 & 11 (depicting example user interface that shows the turn-based, conversational nature of a text message exchange). The near-instantaneous nature of instant messaging and text messaging introduced problems that had no analog to the offline, "brick and mortar" context where the latency of the communications creates the opportunity for extensive consultation prior to a response being sent

and where the users do not expect anything like the flow and narrative thread of a real time conversation.

24. Specifically, in the department messaging context, the symmetry and one-to-one format of conventional instant messages and text messages combined with their real-time conversational nature presented a unique challenge for managing the asymmetric communication between the group and the individual. As an example: A user initially sends or receives a message from a single number representing the department. In some situations, the department might continue to rely on a single member to maintain the conversation; however, in many situations, such as customer support, a single department member may not be the best equipped to address all of the customer's concerns. Alternatively, the department could tap multiple members to respond to the user using the department number, but the department would be unable to keep track of who sent each message. Another approach could rely on department members separately messaging the user from their individual numbers, but the user would then be bombarded by disjointed communications coming from apparent strangers.

25. The '367 Patent addressed this problem by modifying the operation of conventional real time messaging to provide asymmetric information to the department members and department outsider. More specifically, the claimed "department message distribution rules" include rules whereby "the message management server provides an indication of an identity of the department member that the message content is received from in the messages distributed to the identified department members" and "provides an indication in the message distributed to the identified department outsider that the message content is received from the department but does not provide an indication in the message distributed to the identified department outsider of the identity of the department member that the message content is received from." '367 Patent at Claim 1. Compared to conventional real time messaging, additional information is provided to the department members in that a message indicates not only that it is a department message, but also the identity of the individual member who authored the message. In contrast, less information is provided to the outsider, who receives only an indication that the message is from

the department, and no indication which department member it is from. In addition, "the message management server is configured to associate a thread identifier to a message received from a department outsider" (Claim 1) and "to associate a thread identifier to a message received from a department member" (Claim 8), so that even when messages are sent from multiple department members, they can be tracked as a single conversation.

26. The claimed system of the '367 Patent thus manipulates interactions with text messaging to achieve a result that overrides the routine and conventional sequence of events ordinarily triggered by sending a text message. This innovation improved the capabilities of the system as a whole, in particular with respect to handling department messages. For example, "different department members may contribute their particular expertise to a particular thread with an outside customer," but at the same time, "[b]y providing the outside user, such as a customer, with an indication of the department and not individual department members, the customer does not know the individual department member(s) he is communicating with. Thus, if the department member(s) change (e.g., member(s) added or removed from the department, member(s) with greater expertise take over the thread), the customer does not know and only receives an indication of the department he or she is communicating with." '367 Patent at 16:4-6, 16:30-38.

27. The combination of elements claimed in the '367 Patent, and in particular the specific rules specifying asymmetrical treatment of department messages as distributed to department members and department outsiders, went beyond what was well-understood, routine, and conventional in the field. The Patent Office recognized this when it found that, not only were the rules unconventional, they were not found in the prior art at all. '367 Patent, Notice of Allowability at 2-3 ("[N]either Rodkey nor Barbec nor their combination teaches or suggests, providing an indication of an identity of the department member that the message content is received from in the messages distributed to the identified department members.., but [does] not provide an indication in the message distributed to the identified outsider of the identity of the department member that the message content is' received from.") (internal quotations omitted).

The PTO was right to find this because the combination of elements was novel and solved a technological problem in a technical manner that was unknown in the prior art.

28. The ’367 Patent has 18 claims, including independent claim 1. Independent claim 1 recites: “A hosted private branch exchange (PBX) system comprising: non-transitory storage that includes subscriber identifying information that identifies a subscriber to a message routing service; non-transitory storage that includes distribution rules information associated with the identified subscriber; and a message management server configured to receive a message sent over the Internet to the identified subscriber and to send the message over the Internet to one or more devices according to the distribution rules associated with the identified subscriber; wherein the subscriber identifying information identifies a department subscriber to the message routing service and department members; wherein the distribution rules information includes department message distribution rules associated with the identified department subscriber; wherein the department message distribution rules include a first rule for distribution of a message received from a department outsider that is directed to the department; wherein the message management server distributes messages to the identified department members, according to the first rule, that include content of a message received from the department outsider and directed to the department; wherein the message management server is configured to associate a thread identifier to a message received from a department outsider and to include the associated thread identifier with the messages that it distributes to the identified department members according to the first rule; wherein the department message distribution rules include a second rule for distribution of a message received from a department member that is directed to a department outsider; wherein the message management server distributes messages to a department outsider and to the identified department members, according to the second rule, that include message content received from a department member that is directed to the department outsider; wherein the message management server provides an indication of an identity of the department member that the message content is received from in the messages distributed to the identified department members; and wherein the message management server provides an indication in the message

distributed to the identified department outsider that the message content is received from the department but does not provide an indication in the message distributed to the identified department outsider of the identity of the department member that the message content is received from."

29. At least Dialpad Standard, Dialpad Pro, and Dialpad Enterprise (collectively, "the '367 Infringing Products") infringe at least claims 1, 3, 4, 7, and 8 of the '367 Patent.

30. For example, the '367 Infringing Products are a "hosted private branch exchange (PBX) system." *See, e.g.*, http://blog.dialpad.com/blog/the-life-of-a-call-part-4-the-future-is-now (Dialpad is a "cloud-based PBX system").

31. In addition, the '367 Infringing Products include storage "that includes subscriber identifying information that identifies a subscriber to a message routing service" and "the subscriber identifying information identifies a department member subscriber to the message routing service and department members." *See, e.g.*, https://help.dialpad.com/hc/en-us/articles/115003378526-Create-a-Department (showing how to create a department associated with a particular subscriber line) (individual subscriber identifying information can similarly be input through the subscriber profile interface):




32. The '367 Infringing Products further include storage "that includes distribution rules information associated with the identified subscriber" and "the distribution rules information includes department message distribution rules associated with the identified department subscriber." The '367 Infringing Products enable storage of distribution rules associated with an identified subscriber. Similarly, the '367 Infringing Products enable storage of department

message distribution rules associated with the identified department subscriber, as shown below, where the department members to whom department messages should be routed can be specified:




33. Dialpad's servers are also "configured to receive a message sent over the Internet to the identified subscriber and to send the message over the Internet to one or more devices according to the distribution rules associated with the identified subscriber"; and in the '367 Infringing Products, "the department message distribution rules include a first rule for distribution of a message received from a department outsider that is directed to the department" and "the message management server distributes messages to the identified department members, according to the first rule, that include content of a message received from the department outsider and directed to the department." *See, e.g.*, https://help.dialpad.com/hc/en-us/articles/212177303-Messaging-in-Dialpad-FAQs; https://help.dialpad.com/hc/en-us/articles/210456583-Handle-Dept-Calls-Messages- (showing that (1) SMS messages can be sent over the Internet to a subscriber and (2) department messages will be sent to individual department members):

**Can I send an SMS/MMS to the Main Line or Department?**

Definitely. You can send and receive both SMS/MMS from your Main Line or Departments. Learn how to manage your Main Line/Department messages.

## Receive a Message

When you receive a message to your Department, you'll be notified on the sidebar next to your Department's name. We'll also push a notification to your Android device (no iOS or desktop app).




34. Further, in the '367 Infringing Products, "the message management server is configured to associate a thread identifier to a message received from a department outsider and to include the associated thread identifier with the messages that it distributes to the identified department members according to the first rule." *See, e.g.*, https://help.dialpad.com/hc/en-us/articles/115003317366-Messaging-Options- (showing threaded messages can be deleted and confirming existence of thread identifier):

## Delete a Chat

Click the drop-down arrow on your message to display options to **Delete** or **Delete Thread**.

If you select Delete, the currently selected message will be deleted. If you select Delete Thread, all messages within the conversation thread will be deleted (including call and voicemail notifications).

35. Further, in the ’367 Infringing Products, “the department message distribution rules include a second rule for distribution of a message received from a department member that is directed to a department outsider; wherein the message management server distributes messages to a department outsider and to the identified department members, according to the second rule, that include message content received from a department member that is directed to the department outsider”; and “the message management server provides an indication in the message distributed to the identified department outsider that the message content is received from the department but does not provide an indication in the message distributed to the identified department outsider of the identity of the department member that the message content is received from.” *See, e.g.*, https://help.dialpad.com/hc/en-us/articles/210456583-Handle-Dept-Calls-Messages-#send-a-message (messages from “Sales Department”):




36. Further, in the ’367 Infringing Products, “the message management server provides an indication of an identity of the department member that the message content is received from in the messages distributed to the identified department members.”

37. The preceding discussion of claim 1 in the ’367 Patent is exemplary. The ’367 Infringing Products infringe other claims in the ’367 Patent upon same or similar grounds.

RingCentral reserves its right to identify additional claims and additional infringing products as supported by discovery in the case.

**Dialpad's Infringement of the '496 Patent**

38. RingCentral owns, and has for all relevant times owned, all right, title, and interest in the '496 Patent, titled "Call Management Interfaces." (See Exhibit B). Each of the claims of the '496 Patent is presumed valid. The '496 Patent solves the problem of managing call handling rules that are time dependent (*e.g.*, one set of rules might apply during "business hours" and another during "off hours") in a cloud-based, virtual PBX, VoIP system.

39. Specifically, the '496 Patent claims systems and methods that enable a multitude of system users to create and update their own time-dependent call handling rules for routing calls according to different parameters during different times of day using a user interface located on their mobile phones and personal computers. *See* '496 Patent at 10:13-14, 10:25-29, 10:53-62 ("FIGS 3A-3N shows examples of various user interfaces that can be used to configure/manage virtual PBX services…. A *user* or administrator can access the user interfaces using…a web browser available on a mobile device or personal computing platform…. Users of each extension can have an individualized set of pre-provisioned and pre-configured virtual PBX services, optionally customized by themselves….") (emphasis added).

40. As the inventors note, in traditional PBX systems, "[s]ervices and features typically are provisioned by the telecommunications network or on-premise servers and not the telephone device itself." '496 Patent at 1:22-24. This limitation was a function of the nature of on-premise solutions – which typically served the users in a single building or campus and which therefore had no need either to account for geographically dispersed users and/or users who connected to their PBX through mobile phones. Instead, traditional on-premise PBXs served the hard-wired extensions of the phones located in the building(s) of the premises housing the PBX.

41. In modern workforces, users can be located all over the globe and may have a wide variety of mobile devices which they use to access their call services. This fact has created technical problems that cannot readily be solved with on-premise PBX solutions.

42. For example, it is not at all unusual for workers to want to connect to their work call services using mobile phones and/or with VOIP enabled laptops as they travel or work remotely. But existing PBX's cannot easily solve that problem because they are centrally provisioned – which means (among other things) that they aren't conventionally provisioned outside of normal working hours. For example, a user who is traveling to a different time zone may not have access to a conventional centralized provisioning system during ***his*** normal business hours because the location in which he or she is located may be in a different time zone from the conventional PBX. Thus for example, a user in California who needs or wants to change the provisioning of his mobile phone at 3 pm on a Friday would not be able to do that with a conventional PBX located in New York, both because conventional PBXs frequently cannot provision mobile phones, but also because it would be after hours in New York (where our hypothetical on-premise PBX is located). Put differently, because conventional on-premise PBXs locate authority for changing the provisioning of the devices to which they route calls ***in a centralized location***, they struggle to accommodate after hours requests, let alone remote requests.

43. To address this problem, the inventors of the '496 Patent took the unconventional approach of moving the provisioning tool to an interface that can be accessed through a web browser and locating ***control*** in that tool. This is expressly reflected in the claims which call for the use of a user interface which expressly issues ***commands*** (*e.g*. directives) rather than ***requests*** (which is what you would provide if you were asking for a provisioning change from a system in which the authority to make those changes resided with a centralized administrator) to the PBX. *See* '496 Patent at claim 1, elements 3 and 4 (calling for presenting a user interface, and then for the PBX to "reciev[e] a user command"). Thus, the claims are directed to creating an interface that is presented to a user and then receiving from that interface a "user command" that changes the provisioning of the PBX. That is a different (and unconventional) implementation relative to the centralized provisioning that prior-art PBXs required. Importantly, the patent says expressly that the user interface can be "web based interfaces accessible through a browser" which, in turn,

shows that the claims allow for provisioning to be performed from a remote device connected to the PBX over the web and though which interface the user has the ***authority*** to change the provisioning. That is unconventional relative to the implementation of on-premise PBXs which conventionally vested authority exclusively in a centralized location / with a centralized administrator. And to the extent the Court finds otherwise with respect to, *e.g.* Claim 1, this is express in Claim 9 which calls for the user interface to be located on "the communication device" associated with "the extension" that is itself being configured. Put differently, Claim 9 expressly calls for the communication device associated with the extension being provisioned to provide the command that changes its own provisioning. That is unconventional relative to on-premise PBXs which did not locate the tools that could control the provisioning of an extension on a web-enabled interface that was accessed from the end point. And, the patent ***expressly*** notes that locating this provisioning authority in the end-point devices was unconventional relative to the prior art. *See* '496 Patent at 1:22-24 (In the prior art "[s]ervices and features typically are provisioned by the telecommunications network or on-premise servers and not the telephone device itself.").

44. In addition to an unconventional *location* for an authoritative provisioning tool, the claims of the '496 patent provide for an unconventional implementation that solves a technical problem insofar they recite the use of call handling rules that are based on the time the call is received ***and*** which can be set by the impacted user. In prior-art PBX systems, there was little need for such rules because the nature of a centralized system, (*e.g.* in an office building), is that it handles the calls received according to the business hours of the facility. Thus, traditionally, when a call came in during business hours, it would be routed to the appropriate extension within the building and answered by a user. When a call came in after hours, it would still be routed to the same extension but the extension would not be answered and the call would go to voice mail. Put differently, with conventional PBXs there would be no difference in the *routing* rule used based on the time of day, and in the limited instances in which the prior art did provide for time

specific routing rules, those rules were not conventionally individualized but would instead, *e.g.* forward all calls received after 5pm to an answering service.

45. The '496 patent solved for these problems by including in the implementation individually flexible rules based on the time at which the call is received. Those rules allow a given worker to decide when and where a call will be routed for him or herself – based on when (relative to, *e.g.* their individual preferences, requirements or time zones) they want or are required to be available. This is reflected in the claims which expressly recite: "receiving a user command to update at least one configuration parameter, wherein the at least one updated configuration parameter includes an update to a first call handling rule in a first set of call handling rules associated with calls made during a first period of time." *See, e.g,* '496, claim 1. As this limitation makes express, the individual user can make use of the remotely available provisioning system to "command" the system to route calls based on the time when the call is made. *See also id.* at Claim 9 (which is express that the time based routing rule is provided for "handling incoming calls to the extension" from which the provisioning command is received). Thus, the '496 patent provides for the then-unconventional implementation of individually determinable time-based call routing rules. These rules solved the problems created by traditional PBXs – *i.e.* the fact that conventional provisioning rules did not route based on the time the call was received and, in the limited situations were such time-based rules did exist, it was not conventional to create a system in which those rules could be separately controlled and configure for and by an individual user. *See e.g. id.* at Claim 3 ("The method of claim 1, where receiving the *user* command to update at least one configuration parameter includes receiving the *user* command to add, delete or modify at least one call handling rule.").

46. The fact that claims of the '496 patent allow for individual users to control the time-based routing of their own calls is also underlined by the contrast between the claim language discussed above and the specification's discussion of various functions that only a system administrator can perform. *See* '496 Patent at 11:42-50 ("The auto-receptionist interface element 306, when activated, can auto-manage all of the virtual PBX services on behalf of the extension

user. For example, when activated, the auto-receptionist can play a computer-generated greeting to callers of all incoming calls. The *administrator* also can select one of the personal greetings stored in a database…and configure the auto-receptionist to play the selected personal greeting instead of the computer-generated greeting.") (emphasis added); *id.* at 13:19-21 ("If desired, the *administrator* can add one or more additional extension users to the extension user category using the "Add User" button….") (emphasis added). Thus by reciting that the user, and not (more narrowly) an administrator provides the commands that control the time based routing rules, the '496 Patent makes it clear that the claims provide for individual users to control their own provisioning.

47. The '496 patent thus claims a system that allows the user of a particular virtual PBX extension to locally provision her own call handling rules for calls received during certain times. This innovation improves the call handling capabilities of virtual PBX systems because it allows the users who are most familiar with their own specific call handling rule needs to flexibly set rules so as to, for example, allow calls to be forwarded to the user's mobile device during certain hours, or sent to the user's desk phone during others. This local provisioning architecture was unconventional at the time of the invention of the '496 patent. This is especially true *in combination with* the fact that the '496 locates the control of this provisioning on an interface that can be accessable over the web and by a user's own mobile devices. After all, if a system just had one aspect of this solution (either remote provisioning or individual user control over time-based rules) it would lack the flexibility to meet the needs of a remote or geographically dispersed worker – e.g. the kind of worker served by a vPBX and who cannot generally be served by a conventional PBX. Thus, for example, a system that allowed for individual rules (but didn't have remote provisioning) would not be able to accommodate after hours changes, while a system that allowed for remote provisioning but not for individual control over time-based routing rules would struggle to accommodate the needs of an individual who is not located in the same time zone as his co-workers. Put differently, while each of the structural location of the provisioning tool and the individual time-based routing rules are *in themselves* unconventional, when put

together (as they are in the claims of the '496 patent) they provide a dramatically different and unconventional implementation that overcame technical limitations of a centrally managed, on-premise PBX and which problems are unique to a virtual PBX – i.e. which only arise when you have a PBX that is attempting to manage the calls of a remotely-connected workforce.

48. The '496 Patent has 21 claims, including independent claim 1. Independent claim 1 recites: "A method comprising: receiving a user request to access profile information associated with an extension on a virtual private branch exchange (PBX) network; retrieving one or more configuration parameters associated with the extension, wherein the one or more configuration parameters include a plurality of sets of call handling rules for handling incoming calls to the extension, and wherein each set of call handling rules is associated with calls made during different respective periods of time; presenting a user interface including displaying the one or more retrieved configuration parameters in the interface; receiving a user command to update at least one configuration parameter, wherein the at least one updated configuration parameter includes an update to a first call handling rule in a first set of call handling rules associated with calls made during a first period of time; and updating the profile information based on the at least one updated configuration parameter, wherein updating the profile information comprises updating the first call handling rule for calls made during the first period of time."

49. At least Dialpad Standard, Dialpad Pro, and Dialpad Enterprise (collectively, "the '496 Infringing Products") infringe at least claims 1, 3-11, 13, 15, and 16 of the '496 Patent.

50. For example, the '496 Infringing Products perform a method comprising "receiving a user request to access profile information associated with an extension on a virtual private branch exchange (PBX) network. *See, e.g.*, http://blog.dialpad.com/blog/the-life-of-a-call-part-4-the-future-is-now ("Dialpad is the cloud-based PBX solution to your traditional PBX

limitations."); https://help.dialpad.com/hc/en-us/articles/115003378526-Create-a-Department (showing profile information associated with a department phone number):




51. The '496 Infringing Products further "retriev[e] one or more configuration parameters associated with the extension, wherein the one or more configuration parameters include a plurality of sets of call handling rules for handling incoming calls to the extension, and wherein each set of call handling rules is associated with calls made during different respective periods of time"; "present[] a user interface including displaying the one or more retrieved configuration parameters in the interface"; "receiv[e] a user command to update at least one configuration parameter, wherein the at least one updated configuration parameter includes an update to a first call handling rule in a first set of call handling rules associated with calls made during a first period of time"; and "updat[e] the profile information based on the at least one updated configuration parameter, wherein updating the profile information comprises updating the first call handling rule for calls made during the first period of time." *See, e.g.*, https://help.dialpad.com/hc/en-us/articles/115000029703-Set-Business-Hours- (showing how to specify, for a department phone number, periods of time that are business hours and periods of time that are closed hours); https://help.dialpad.com/hc/en-us/articles/210457423-Set-Call-

Routing-Rules-on-Main-Line-Departments (showing how to specify different call handling rules for "open" hours and "closed" hours and various possible sets of call handling rules):




52. The preceding discussion of claim 1 in the '496 Patent is exemplary. The '496 Infringing Products likely infringe other independent and dependent claims in the '496 Patent, respectively, upon same or similar grounds. RingCentral reserves its right to identify additional claims and additional infringing products as supported by discovery in the case.

**Dialpad's Infringement of the '669 and '363 Patents**

53. RingCentral owns, and has for all relevant times owned, all right, title, and interest in the '669 Patent, titled "Synchronization in Unified Messaging Systems." (*See* Exhibit C). Each of the claims of the '669 Patent is presumed valid.

54. RingCentral owns, and has for all relevant times owned, all right, title, and interest in the '363 Patent, titled "Synchronization in Unified Messaging Systems." (*See* Exhibit D). Each of the claims of the '363 Patent is presumed valid. The '363 Patent claims priority to the '669 Patent and the two share a common specification.

55. The ’669 Patent claims inventions that address technological challenges created when there are multiple client devices synchronizing several different types of messages (*e.g.*, facsimiles, text messages, voice messages, IMs, SMS messages, and emails) with a single set of server messages that must be cohesively reconciled. The ’669 Patent accomplishes this using an innovative architecture (local client synchronization) and unconventional method (discrepancy assessment) in a hosted virtual PBX environment. Put simply, the ’669 Patent solves the problem of how to seamlessly synchronize different types of messages (operating across different types of communications platforms) across multiple different types of communications devices relying on only a single set of data about those messages at the server by performing a “discrepancy assessment” in order to synchronize all of those different types of messages across different types of communication systems at each unique end user device.

56. The ’669 Patent claims “a unified messaging system” with multiple client devices that synchronize with a server. *See, e.g.*, ’669 Patent, at Claim 22 (“A unified messaging system” and “first client”/”second client”); *Id.* at 2:24-33 (“As shown in FIG. 1, a unified messaging system 100 integrates several different communications media to allow a user 110 to send and retrieve voice 112 a, fax 112 b, and messages 112 c (e.g., e-mail, text, etc.) from a single interface, whether it be a phone 104 a, a fax machine 104 b, or a personal computer 104 c.”). The claim element “a unified messaging system” is critical to understanding the problem solved by the ’669 Patent inventions. As shown in Figure 1, a “unified messaging system” is not just a means to send messages across a hosted PBX system but it is a specific type of messaging system, *i.e.*, one that is “unified” insofar as it can host and synchronize messages of drastically different formats and types (*e.g.*, IMs, voice mails, and facsimiles) over different communications networks (*e.g.*, wireless, Internet, and POTS networks) and across multiple types of end user devices associated with a single user (*e.g.*, a mobile phone, desktop phone, or laptop). *See, e.g.*, ‘669 Patent at Fig. 1. The ’669 Patent inventors conceived of an innovative synchronization architecture with an application at each of the multiple client devices (again, those devices are heterogenous, *e.g.*, a laptop, smart phone, tablet, *etc*.). The claimed system innovatively de-

centralizes the synchronization by architecting a synchronization application at *each* client device and not on the central server. *See id.* at Claim 22 ("a first synchronization application"/ "a second synchronization application"); 4:1-11 ("The client 104 further includes a synchronization application 308, which is responsible for synchronizing the messages on the server 102 with the messages on the client 104."). The '669 Patent also applies the unconvential technique of a discrepancy assessment (as opposed to the prior art which used a true/false, 1:1 flag method). *See* '669 Patent, Claim 22 (describing each client as performing "at least one synchronization action") *compare* U.S. Patent No. 6,792,085 to *Rigaldies* dated Sep. 10, 1999 (describing a 1:1 flag method capable of only synchronizing a single client with a single server). As a result, the claimed invention is able to ensure seamless synchronization across multiple types of devices, for different types of messages, and across different communications networks.

57. The '669 Patent specifically highlights that its "discrepancy assessment" synchronization invention is an improvement over the prior art. '669 Patent, 1:62-2:4 ("In various implementations, *one or more of the following advantages may be present*. Based on the results of the discrepancy assessment established during the synchronization, the synchronization application creates a list of synchronization actions that can be performed in order to synchronize the messages on the server with the messages on the client without having a need to maintain a history of all prior messages on the client. The state of messages on the client may also be updated so that requests may be sent to the server to update the state of messages on the serve.") (emphasis added). As did the examiner in 2014 re-examination proceedings. *See, e.g.*, June 22, 2014 Notice of Intent to Issue Reexam at 4 (recognizing that the prior art did not teach a method of synchronizing a single set of server messages with more than one client device directly: "the proposed combination [of prior art] lacks any specific teaching as to how the modified-flag technique of [the prior art will] work with multiple clients."). And, as did a POSITA in the industry. *See* Declaration of Dr. George Edwards in Support of RingCentral's Reexam (July 3, 2012) (Dr. George Edwards a founding member in Blue Cell Software LLC with 14 years of

industry and academic experience explained the limitations in the prior art related to single-server-client synchronization).

58. The claims in the ’669 Patent reflect this. The ’669 Patent claims require “a unified messaging system” with “a first synchronization application” and a “a second synchronization application” on each of the client devices. *See, e.g.,* ’669 Patent at Claim 22. The local client synchronization applications use a discrepancy assessment technique to perform “at least one synchronization action selected from the group consisting of: a read/unread status of a first client message to read when a read/unread status of a corresponding server message is set to read and unread when the read/unread status of the corresponding server message is set to unread; and a read/unread status of a server message to read when a read/unread status of a corresponding first client message is set to read, and unread when the read/unread status of the corresponding first client message is set to unread.” *See id.* at Claim 22; *see also id.* at 4:48-5:12 (“Based on the results of the discrepancy assessment (step 311) the synchronization application 308 creates a list of synchronization actions that need to be performed in order to synchronize the messages on the server 102 with the messages on the client 104 (step 313)…”). The discrepancy assessment synchronization method is the only non-prior art synchronization method disclosed in the specification. *See, e.g., id.* at 4:48-5:12 (“Once the client 104 receives the state of the messages stored on the server 102 (step 307), the synchronization application 308 identifies the state of the messages stored on the client 104 (step 309) using the client message access module 304. Subsequently, the client’s synchronization application 308 assesses the discrepancies between the state of messages stored on the server 102 and the state of messages stored on the client 104 (step 311).”). The plain language in the claims—describing the synchronization actions (setting a read/unread status of a client message and server message respectively)—describe the synchronization actions taken by the synchronization application as a result of a discrepancy assessment disclosed in the specification. *See* ’669 Patent at Claim 22 *compare with id.* at 5:9-44 (“Based on the results of the discrepancy assessment (step 311) the synchronization application 308 creates a list of synchronization actions that need to be performed in order to synchronize the

messages on the server 102 with the messages on the client 104 (step 313). The synchronization actions can include … 3) If a message on the server 102 has been marked as 'read' since the last synchronization, the corresponding message on the client 104 is also marked as 'read.' 4) If a message on the client 104 has been marked as 'read' since the last synchronization, the corresponding message on the server 102 is also marked as 'read'. 5) If a message on the server 102 has been marked as 'unread' since the last synchronization, the corresponding message on the client 104 is also marked as 'unread'. 6) If a message on the client 104 has been marked as 'unread' since the last synchronization, the corresponding message on the server 102 is also marked as 'unread'."). Thus, although the claims do not explicitly use the term "discrepancy assessment," the invention's use of a discrepancy assessment will be made clear during the construction of the closely related terms that the claims do use, *e.g.* "synchronization application" and "synchronization application." *See, e.g.*, *id.* at Claim 22.

59. Ultimately, the benefits of this invention are that it allows the single set of server messages to synchronize across multiple clients, minimizes the of synchronization errors between the client devices, and decreases the risk of errors caused by network connectivity and other technical issues. These benefits do not merely use a computer as a tool to carry out some abstract task, but rather constitute unconventional improvements to the way that computer data is synchronized in a unified messaging system.

60. Similarly, the '363 Patent claims systems and methods that enable synchronizing fax or voicemail messages on a server with fax or voicemail messages on a client device using a discrepancy assessment. The '363 Patent is similar to the '669 Patent, in that the differences between the prior art and the claimed inventions hold true. However, the '363 independent claims explicitly claim the unconventional synchronization method of a "discrepancy assessment." *See, e.g.*, '363 Patent at Claim 1 ("creating a list of one or more synchronization actions based on results of the discrepancy assessment."). Unlike the '669 Patent, the '363 Patent claims do not explicitly claim a "first client" and a "second client." Nevertheless, the fact that the claimed invention must work by synchronizing a single set of server messages across multiple client

devices is an essential limitation of the claims, as the independent claims specifically recite that the client operates in a "unified messaging system," *i.e.*, a messaging system that enables a single user to send and receive different types of messages across different types of communications networks to and from different types of end-user devices that are associates with a single end user, i.e., across multiple heterogenous devices. This is a limitation that will be made clear through the construction of certain claim terms, including "unified messaging system."

61. The '669 Patent has 13 claims, including independent claim 22. Independent claim 22 recites: "A unified messaging system comprising: a computer implemented server including a processor configured to store a plurality of server messages grouped into a message cluster, the server messages including voicemail messages and fax messages for a client; a first client configured to store a first plurality of client messages, the first client messages including voicemail messages and fax messages for the first client and corresponding to the plurality of server messages; a first synchronization application for synchronizing the first client messages with the server messages associated with the first client including performing at least one synchronization action selected from the group consisting of: a read/unread status of a first client message to read when a read/unread status of a corresponding server message is set to read and unread when the read/unread status of the corresponding server message is set to unread; and a read/unread status of a server message to read when a read/unread status of a corresponding first client message is set to read, and unread when the read/unread status of the corresponding first client message is set to unread; a second client that is not the first client configured to store, separately from the first plurality of client messages, a second plurality of client messages, the second client messages including voicemail messages and fax messages for the second client and corresponding to the plurality of server messages; a second synchronization application for synchronizing the second client messages with the server messages including performing at least one synchronization action selected from the group consisting of: a read/unread status of a second client message to read when a read/unread status of a corresponding server message is set to read, and unread when the read/unread status of the corresponding server message is set to unread; and

a read/unread status of a server message to read when a read/unread status of a corresponding second client message is set to read and unread when the read/ unread status of the corresponding second client message is set to unread."

62. At least Dialpad Standard, Dialpad Pro, and Dialpad Enterprise (collectively, "the '669 Infringing Products") infringe at least claims 22, 23, 26, 27, 28, 30, and 31 of the '669 Patent.

63. For example, the '669 Infringing Products are a "unified messaging system." *See, e.g.*, https://www.dialpad.com/ (describing Dialpad as "the AI-powered cloud based phone system that powers voice, video, and messages all from your existing devices.").

64. Further, the '669 Infringing Products include "a computer implemented server including a processor configured to store a plurality of server messages grouped into a message cluster, the server messages including voicemail messages and fax messages for a client"; "a first client configured to store a first plurality of client messages, the first client messages including voicemail messages and fax messages for the first client and corresponding to the plurality of server messages;" "a first synchronization application for synchronizing the first client messages with the server messages associated with the first client including performing at least one synchronization action selected from the group consisting of a read/unread status of a first client message to read when a read/unread status of a corresponding server message is set to read and unread when the read/unread status of the corresponding server message is set to unread;" and "a read/unread status of a server message to read when a read/unread status of a corresponding first client message is set to read, and unread when the read/unread status of the corresponding first client message is set to unread." *See, e.g.*, https://help.dialpad.com/hc/en-us/articles/115004433163-Release-Notes-Desktop-Apps#december-2017 ("Refresh your app at any time to ensure you are always up to date and see your latest conversations and messages with the new refresh button located at the top.") (demonstrating that a user's local instance of Dialpad can be refreshed, i.e., synchronized, with Dialpad's cloud-based servers in order to update a user's latest conversations and messages); https://www.dialpad.com/office/features/fax/ ("Dialpad's

Digital Fax feature allows you to send and receive fax documents just as you would with a traditional fax machine, only through Dialpad on your desktop or laptop computer. And with Dialpad's simple and user friendly interface, sending a fax is as easy as sending an email.") (demonstrating that Dialpad's system includes synchronization of fax messages); https://www.dialpad.com/office/features/voicemail/ ("All of your voicemail messages are automatically saved to your inbox under the 'Voicemails' tab. Open your inbox to play back a voicemail, listen in to a voicemail as it's being recorded, or delete messages that you no longer need.") (demonstrating that Dialpad's system includes synchronization of voice messages); *see also* https://www.dialpad.com/resources/how-to-videos# (demonstrating, in the snapshot from a Dialpad "how to video," that a "green dot" indicates an unread message, whereas "no dot" indicates a read message):




65. The '669 Infringing Products also include "a second client that is not the first client configured to store, separately from the first plurality of client messages, a second plurality of client messages, the second client messages including voicemail messages and fax messages for the second client and corresponding to the plurality of server messages"; "a second synchronization application for synchronizing the second client messages with the server messages including performing at least one synchronization action selected from the group consisting of a read/unread status of a second client message to read when a read/unread status of a corresponding server message is set to read, and unread when the read/unread status of the corresponding server message is set to unread"; and "a read/unread status of a server message to read when a read/unread status of a corresponding second client message is set to read and unread

when the read/ unread status of the corresponding second client message is set to unread." *See, e.g.*: https://www.dialpad.com/pricing (Dialpad Standard enables "1-100 users"; Dialpad Pro requires "3 user minimum"; Dialpad Enterprise requires "100 user minimum") (demonstrating that Dialpad's system synchronizes messages, including the messages' unread/read status, across multiple user devices (*i.e*., clients)).

66. The '363 Patent has 30 claims, including independent claim 16. Independent claim 16 recites: "A unified messaging system comprising: a server having at least one processor and memory, the server capable of operatively coupling to a data network; a server message storage module configured to store a plurality of server messages, the plurality of server messages including at least one voicemail or at least one fax; a client message storage module configured to store a plurality of client messages, the plurality of client messages including at least one voicemail or at least one fax corresponding to the at least one voicemail or the at least one fax of the plurality of server messages; and a synchronization application configured to: send a network request to the server over the data network; receive a network response to the network request from the server over the data network, the network response comprising state information about the plurality of server messages in the server message storage module; identify state information about the plurality of client messages in the client message storage module; perform a discrepancy assessment between the state information about the plurality of server messages and the state information about the plurality of client messages; create a list of one or more synchronization actions based on results of the discrepancy assessment; and perform the synchronization actions in the list."

67. At least Dialpad Free, Dialpad Standard, Dialpad Pro, and Dialpad Enterprise (collectively, "the '363 Infringing Products") infringe at least claims 1, 14, 16, and 29 of the '363 Patent. The '363 Infringing Products infringe exemplary claim 16 of the '363 Patent for the same reasons that the '669 Infringing Products infringe at least claim 22 of the '669 Patent.

68. The preceding discussion of claim 22 in the '669 Patent and claim 16 in the '363 Patent is exemplary. The '669 Infringing Products and the '363 Infringing Products likely

infringe other claims in the ’669 and ’363 Patents, respectively, upon same or similar grounds. RingCentral reserves its right to identify additional claims and additional infringing products as supported by discovery in the case.

**COUNT I**

**INFRINGEMENT OF U.S. PATENT NO. 8,483,367**

69. RingCentral incorporates paragraphs 1-68 by reference.

70. Dialpad’s ’367 Infringing Products directly and indirectly infringe the ’367 Patent.

71. Dialpad has and continues to make, use, sell, and offer for sale the Infringing Products that are covered by at least claims 1, 3, 4, 7, and 8 of the ’367 Patent, including without limitation by way of the ’367 Infringing Products.

72. As pled *supra*, Dialpad has had knowledge of its infringement of the ’367 Patent since at least July 20, 2018. Dialpad indirectly infringed and continues to indirectly infringe the ’367 Patent by, among other things, actively inducing its customers to use the ’367 Infringing Products in an infringing manner and contributing to the direct infringement by others of the ’367 Infringing Products in an infringing manner, including through Dialpad’s website, advertisements, marketing materials, tutorials, technical support, and instructional guides that Dialpad specifically targets to its customers. By way of example, the images excerpted throughout this Second Amended Complaint, came from these types of Dialpad targeted materials and are exemplary of Dialpad’s indirect infringement. Further, Dialpad does so knowing that there is no other non-infringing substantial use for the department messaging feature in the ’367 Infringing Products and that the department messaging feature was developed or especially adapted for use in an infringing manner.

73. RingCentral has suffered damages as a result of Dialpad’s infringement of the ’367 Patent and will continue to suffer damages as long as those infringing activities continue, the amount of those damages to be proven at trial.

74. RingCentral has been and will continue to be irreparably harmed by Dialpad’s infringement of the ’367 Patent unless and until such infringement is enjoined by this Court.

**COUNT II**

**INFRINGEMENT OF U.S. PATENT NO. 8,355,496**

75. RingCentral incorporates paragraphs 1-68 by reference.

76. Dialpad's '496 Infringing Products directly and indirectly infringe the '496 Patent.

77. Dialpad has and continue to make, use, sell, and offer for sale the Infringing Products that are covered by at least claims 1, 3-11, 13, 15, and 16 of the '496 Patent, including without limitation by way of the '496 Infringing Products.

78. As pled *supra*, Dialpad has had knowledge of its infringement of the '496 Patent since at least the filing of this First Amended Complaint. Dialpad indirectly infringed and continues to indirectly infringe the '496 Patent by, among other things, actively inducing its customers to use the '496 Infringing Products in an infringing manner and contributing to the direct infringement by others of the '496 Infringing Products in an infringing manner, including through Dialpad's website, advertisements, marketing materials, tutorials, technical support, and instructional guides that Dialpad specifically targets to its customers. By way of example, the images excerpted throughout this Second Amended Complaint, came from these types of Dialpad targeted materials and are exemplary of Dialpad's indirect infringement. Further, Dialpad does so knowing that there is no other non-infringing substantial use for the call management interface feature in the '496 Infringing Products and that the call management feature was developed or especially adapted for use in an infringing manner.

79. RingCentral has suffered damages as a result of Dialpad's infringement of the '496 Patent and will continue to suffer damages as long as those infringing activities continue, the amount of those damages to be proven at trial.

80. RingCentral has been and will continue to be irreparably harmed by Dialpad's infringement of the '496 Patent unless and until such infringement is enjoined by this Court.

**COUNT III**

**INFRINGEMENT OF U.S. PATENT NO. 7,702,669**

81. RingCentral incorporates by reference paragraphs 1-68.

82. Dialpad's '669 Infringing Products directly and indirectly infringe the '669 Patent.

83. Dialpad has and continues to make, use, sell, and offer for sale the Infringing Products that are covered by at least claims 22-23, 26-28, and 30-31 of the '669 Patent, including without limitation by way of the '669 Infringing Products.

84. As pled *supra*, Dialpad has had knowledge of its infringement of the '669 Patent since at least July 20, 2018. Dialpad indirectly infringed and continues to indirectly infringe the '669 Patent by, among other things, actively inducing its customers to use the '669 Infringing Products in an infringing manner and contributing to the direct infringement by others of the '669 Infringing Products in an infringing manner, including through Dialpad's website, advertisements, marketing materials, tutorials, technical support, and instructional guides that Dialpad specifically targets to its customers. By way of example, the images excerpted throughout this Second Amended Complaint, came from these types of Dialpad targeted materials and are exemplary of Dialpad's indirect infringement. Further, Dialpad does so knowing that there is no other non-infringing substantial use for the message synchronization feature in the '669 Infringing Products and that the message synchronization feature was developed or especially adapted for use in an infringing manner.

85. RingCentral has suffered damages as a result of Dialpad's infringement of the '669 Patent and will continue to suffer damages as long as those infringing activities continue, the amount of those damages to be proven at trial.

86. RingCentral has been and will continue to be irreparably harmed by Dialpad's infringement of the '669 Patent unless and until such infringement is enjoined by this Court.

## COUNT IV

## INFRINGEMENT OF U.S. PATENT NO. 8,600,363

87. RingCentral incorporates by reference paragraphs 1-68.

88. Dialpad's '363 Infringing Products directly and indirectly infringe the '363 Patent.

89. Dialpad has and continues to make, use, sell, and offer for sale the Infringing Products that are covered by at least claims 1, 14, 16, and 29 of the ’363 Patent, including without limitation by way of the ’363 Infringing Products.

90. RingCentral has suffered damages as a result of Dialpad’s infringement of the ’363 Patent and will continue to suffer damages as long as those infringing activities continue, the amount of those damages to be proven at trial.

91. As pled *supra*, Dialpad has had knowledge of its infringement of the ’363 Patent since at least July 20, 2018. Dialpad indirectly infringed and continues to indirectly infringe the ’363 Patent by, among other things, actively inducing its customers to use the ’363 Infringing Products in an infringing manner and contributing to the direct infringement by others of the ’363 Infringing Products in an infringing manner, including through Dialpad’s website, advertisements, marketing materials, tutorials, technical support, and instructional guides that Dialpad specifically targets to its customers. By way of example, the images excerpted throughout this First Amended Complaint, came from these types of Dialpad targeted materials and are exemplary of Dialpad’s indirect infringement. Further, Dialpad does so knowing that there is no other non-infringing substantial use for the message synchronization feature in the ’363 Infringing Products and that the message synchronization feature was developed or especially adapted for use in an infringing manner.

92. RingCentral has been and will continue to be irreparably harmed by Dialpad’s infringement of the ’363 Patent unless and until such infringement is enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, RingCentral respectfully requests the following relief:

(a) A judgment that Dialpad has infringed the ’367 Patent in violation of 35 U.S.C. § 271;

(b) A judgment that Dialpad has infringed the ’496 Patent in violation of 35 U.S.C. § 271;

(c) A judgment that Dialpad has infringed the ’669 Patent in violation of 35 U.S.C. § 271;

(d) A judgment that Dialpad has infringed the ’363 Patent in violation of 35 U.S.C. § 271;

(e) A permanent injunction, pursuant to 35 U.S.C. § 271, restraining and enjoining Dialpad, its officers, agents, attorneys, and employees, and those acting in privity or concert with them, and its successors and assigns, from engaging in infringing conduct;

(f) A judgment against Dialpad that the present case is exceptional pursuant to 35 U.S.C. § 285;

(g) An award to RingCentral of such monetary damages to which it is entitled to compensate it for Dialpad’s infringement, with interest as fixed by the Court;

(h) An award to RingCentral of its costs, expenses, and fees, including reasonable attorneys’ fees, in this action; and

(i) Such other relief as this Court may deem just, equitable, and proper.

Dated: March 29, 2019 By: *<u>/s/ Clement Roberts</u>*

Clement Roberts
Amy Van Zant
Lillian Mao
Johanna Jacob
Attorneys for Plaintiff
RINGCENTRAL, INC.

**DEMAND FOR JURY TRIAL**

RingCentral hereby demands a trial by jury on all claims and issues so triable.

Dated: March 29, 2019 By: */s/ Clement Roberts*

Clement Roberts
Amy Van Zant
Lillian Mao
Johanna Jacob
Attorneys for Plaintiff
RINGCENTRAL, INC.